Ben CAPUA, et al., Plaintiffs,

v.

The CITY OF PLAINFIELD, et al., Defendants.

Monica TOMPKINS, Plaintiff,

v.

The CITY OF PLAINFIELD, et al., Defendants.

Civ. A. No. 86–2992.

United States District Court, D. New Jersey.

Sept. 18, 1986.

Justin, Gast, & Kuhn, New Brunswick, N.J., Loccke & Correia, P.A., Englewood, N.J., Robinson, Wayne, Levin, Ricco & La Sala, Newark, N.J., for plaintiffs.

Daniel A. Williamson, Plainfield, N.J., for defendant, City of Plainfield.

## OPINION

SAROKIN, District Judge.

### INTRODUCTION

In the face of widespread use of drugs and its intrusion into the workplace, it is tempting to turn to mass testing as a solution. The issue presented by this case is the constitutionality of such testing of current employees by governmental entities.

Whether such testing may be done in the private sector or be imposed as a condition of accepting employment, even in the public sector, is not here presented. Government has a vital interest in making certain that its employees, particularly those whose impairment endangers their co-workers or the public, are free of drugs. But the question posed by this litigation challenges the means by which that laudable goal is attained, not the goal itself.

Urine testing involves one of the most private of functions, a function traditionally performed in private, and indeed, usually prohibited in public. The proposed test, in order to ensure its reliability, requires the presence of another when the specimen is created and frequently reveals information about one's health unrelated to the use of drugs. If the tests are positive, it may affect one's employment status and even result in criminal prosecution.

We would be appalled at the spectre of the police spying on employees during their free time and then reporting their activities to their employers. Drug testing is a form of surveillance, albeit a technological one. Nonetheless, it reports on a person's off-duty activities just as surely as someone had been present and watching. It is George Orwell's "Big Brother" Society come to life.

To argue that it is the only practical means of discovering drug abuse is not sufficient. We do not permit a search of every house on a block merely because there is reason to believe that *one* contains evidence of criminal activity. No prohibition more significantly distinguishes our democracy from a totalitarian government than that which bars warrantless searches and seizures. Nor can the success of massive testing justify its use. We would not condone the beatings of suspects and the admissibility of their confessions merely because a larger number of convictions resulted.

██ In this matter, long time employees were coerced into testing without notice, without standards and without probable cause or reasonable suspicion. Even if

such testing were justified without such individualized basis, it nonetheless, would be illegal because of the flagrant violation of plaintiffs' due process rights in this instance. Assuming a program of drug testing is warranted, before it may be implemented, its existence must be made known, its methods clearly enunciated, and its procedural and confidentiality safeguards adequately provided.

The harassment, coercion and tactics utilized here, even if motivated by the best of intentions, should cause us all to recognize the realities of government excesses and the need for constant vigilance against intrusions into constitutional rights by its agents. If we choose to violate the rights of the innocent in order to discover and act against the guilty, then we will have transformed our country into a police state and abandoned one of the fundamental tenets of our free society. In order to win the war against drugs, we must not sacrifice the life of the Constitution in the battle.

## FACTS

On May 26, 1986 all fire fighters and fire officers employed by the defendant, City of Plainfield, were ordered to submit to a surprise urinalysis test. At 7:00 A.M. on May 26, the Plainfield Fire Chief and Plainfield Director of Public Affairs and Safety entered the city fire station, secured and locked all station doors and awakened the fire fighters present on the premises. Each fire department employee was required to submit a urine sample while under the surveillance and supervision of bonded testing agents employed by the city. Defendants repeated a substantially similar procedure on May 28 and June 12, 1986 until approximately all of the 103 employees of the Plainfield Fire Department were tested.

Prior to May 26, the Plainfield fire employees had no notice of defendants' intent to conduct mass urinalysis. Such urinalysis had not been provided for in the collective bargaining agreement between the fire fighters and the City. Nor was any written directive, order, departmental policy or

regulation promulgated establishing the basis for such testing and prescribing appropriate standards and procedures for collecting, testing, and utilizing the information derived.

Between July 10 and July 14, 1986, sixteen firefighting personnel were advised that their respective urinalysis had proved positive for the presence of controlled dangerous substances. They were immediately terminated without pay. Those who tested positive were not informed of the particular substance found in their urine or of its concentration. Neither were they provided copies of the actual laboratory results. Written complaints were served ten days later on July 24, 1986, charging these fire fighters with numerous violations including "commission of a criminal act".

At about the same time, employees of the Plainfield Police Department were subjected to similar urine testing. On May 26, 1986, plaintiff Monica Tompkins, a communications operator for the Plainfield Police was ordered to submit a urine sample under the surveillance of a female testing agent. On July 10, Ms. Tompkins was advised by the Chief of Police that her urinalysis had been positive. As a result, Ms. Tompkins was informed that she could either resign without charges being brought or she would be immediately suspended.

Plaintiff fire fighters instituted this action on July 30, 1986, by way of an Order to Show Cause and Verified Complaint. Plaintiff Monica Tompkins filed a related action which will be considered jointly. The Court issued a Temporary Restraining Order mandating the immediate reinstatement of the suspended Plainfield fire fighters and prohibiting further urine testing by defendants pending a plenary determination in this case.

On July 31, 1986 defendants moved to vacate the restraining order. The court denied defendants' motion, but granted leave to re-apply if specific, individualized evidence could be produced demonstrating that a particular fire fighter's job performance was impaired as a result of drugs. To date, no such evidence has been brought before the court.

■ Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief.[1] They seek to have the urine testing declared unconstitutional and to enjoin the City of Plainfield and its agents from further conducting standardless, department-wide urine testing in violation of the Fourth Amendment. The parties have agreed to submit the matter for a final determination on the record before the court conceding that no factual issues exist which would require a hearing.

## DISCUSSION

The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated ...

The essential purpose of the Fourth Amendment is to "impose a standard of reasonableness upon the exercise of discretion by government officials" in order to "safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Delaware v. Prouse*, 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). "The Fourth Amendment thus gives concrete expression to a right of the people which 'is basic to a free society.'" *Id.*, (quoting *Wolf v. Colorado*, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949)). The constitutional issue here arises only if

---

**1.** This Court notes that plaintiffs' cause of action is properly in federal court. The Supreme Court has unambiguously ruled that exhaustion of State judicial or administrative remedies is not a prerequisite to a federal lawsuit under 42 U.S.C. § 1983. *See generally Patsy v. Florida*

*Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). Similarly, federal jurisdiction is appropriate even where, as here, the § 1983 action asserts claims for declaratory and injunctive relief. *Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732, 737 (3d Cir.1983).

the Fourth Amendment is implicated by defendants' conduct. The threshold question then is whether urinalysis constitutes a search and seizure within the meaning of the Fourth Amendment.

Courts have clearly established that individuals retain an expectation of privacy and a right to be free from government intrusion in the integrity of their own bodies. *See Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1978). "One's anatomy is draped with constitutional protection." *United States v. Afanador,* 567 F.2d 1325, 131 (5th Cir.1978). The "taking" of urine has been likened to the involuntary taking of blood which the Supreme Court found to constitute a search and seizure within the Fourth Amendment. *See Schmerber, supra.* Though urine, unlike blood, is routinely discharged from the body so that no actual intrusion is required for its collection, it is normally discharged and disposed of under circumstances that merit protection from arbitrary interference.

Both blood and urine can be analyzed in a medical laboratory to discover numerous physiological facts about the person from whom it came, including, but not limited to recent ingestion of alcohol or drugs. "One does not reasonably expect to discharge urine under circumstances making it available to others to collect and analyze in order to discover the personal physiological secrets it holds." *McDonnell v. Hunter,* 612 F.Supp. 1122, 1127 (D.Iowa 1985). As with blood, each individual has a reasonable expectation of privacy in the personal "information" bodily fluids contain. For these reasons, governmental taking of a urine specimen constitutes a search and seizure within the meaning of the Fourth Amendment. *See McDonnell v. Hunter, supra; Allen v. City of Marietta,* 601 F.Supp. 482, 288–89 (N.D.Ga.1985); *Storms v. Coughlin,* 600 F.Supp. 1214, 1218 (S.D.N.Y.1984); *City of Palm Bay v. Bauman,* 475 So.2d 1322 (D.C.App.Fla. 1985). Most recently, the Third Circuit im-

plicitly confirmed the applicability of Fourth Amendment prohibitions to the taking of urine samples, invoking Fourth Amendment doctrine to determine the constitutionality of urine testing of race horse jockeys. *Shoemaker v. Handel,* 795 F.2d 1136, 1142 (3d Cir.1986) ("the question that arises in this case is whether the administrative search exception extends to warrantless [urine] testing of persons").

Having determined that urine testing constitutes a search and seizure, this court must now evaluate defendants' search under the Fourth Amendment's dictates. The fundamental command of the Fourth Amendment is that searches and seizures be "reasonable." *New Jersey v. TLO,* 469 U.S. 325, 105 S.Ct. 733, 743, 83 L.Ed.2d 720 (1985); *Carroll v. United States,* 267 U.S. 132, 147, 45 S.Ct. 280, 283, 69 L.Ed. 543 (1925). What is reasonable depends upon the context in which a search takes place. Ordinarily a search requires both a warrant and probable cause to qualify as constitutionally reasonable. Yet the Supreme Court has stated that neither element is "an irreducible requirement of a valid search." *New Jersey v. TLO, supra,* 105 S.Ct. at 743. Instead, the ultimate determination of a search's reasonableness requires a judicious balancing of the intrusiveness of the search against its promotion of a legitimate governmental interest. *See Illinois v. Lafayete,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983); *United States v. Villamonte-Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). The Supreme Court has explained:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

Even in the limited circumstances where the Supreme Court has created explicit exceptions to the stringent Fourth Amendment probable cause requirements—e.g. administrative and regulatory searches— the Court has held such exempted searches to a reasonableness standard in order to protect individuals from the abuses possible when government officials are entrusted with "almost unbridled discretion ... as to when ... and whom to search." *Marshall v. Barlow's Inc.*, 436 U.S. 307, 323, 98 S.Ct. 1816, 1826, 56 L.Ed.2d 305 (1978) (invalidating warrantless administrative searches by OSHA where professed enforcement needs were outweighed by privacy interests of employers subjected to inspections); *see also Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

This Court must determine whether the intrusion occasioned by compelling members of the Plainfield Fire Department to submit to compulsory urine testing is sufficiently justified by the governmental interest in ferreting out drugs so as to be "reasonable" within the meaning of the Fourth Amendment.

*Expectation of Privacy*

■ The degree of intrusion engendered by any search must be viewed in the context of the individual's legitimate expectation of privacy. The test for determining when an expectation of privacy is "legitimate" was articulated by Justice Harlan in *Katz v. United States:* "[T]here is a two-fold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967).

Courts have used this standard to differentiate between levels and degrees of intrusiveness among searches and seizures. As measured by the expectation of privacy, inspections of personal effects are generally least intrusive, while breaches of the "integrity of the body" result in the greatest invasion of privacy.

■ Applied to the facts at hand, defendants' mass urine testing program subjected plaintiffs to a relatively high degree of bodily intrusion. As stated earlier, while urine is routinely discharged from the body, it is generally discharged and disposed of under circumstances that warrant a legitimate expectation of privacy. The act itself, totally apart from what it may reveal, is traditionally private. Facilities both at home and in places of public accommodation recognize this privacy tradition. In addition, society has generally condemned and prohibited the act in public. The "interests of human dignity and privacy" which compelled Justice Brennan to find mandatory blood extractions greatly intrusive, *Schmerber, supra,* 384 U.S. at 770, 86 S.Ct. at 1835, are implicated with equally compelling force when individuals are directed to urinate in the presence of a government agent. The requirement of surveillance during urine collection forces those tested to expose parts of their anatomy to the testing official in a manner akin to strip search exposure. Body surveillance is considered essential and standard operating procedure in the administration of urine drug tests, (See Brief Submitted on Behalf of Defendants' at 3), thus heightening the intrusiveness of these searches.[2] A urine test done under close surveillance of a government representative, regardless of how professionally or courteously conducted, is likely to be a very embarrassing and humiliating experience. *See United States v. Sandler,* 644 F.2d 1163, 1167 (5th Cir.1981) (en banc).

---

2. The district court in deciding *Shoemaker v. Handel,* 608 F.Supp. 1151 (D.N.J.1985); *aff'd* 795 F.2d 1136 (3rd Cir.1986), concluded that urinalysis was a more minimal bodily intrusion than either blood extractions or body cavity and strip searches. In *Shoemaker* though, urine specimens were collected privately by the individual being tested and later submitted for analysis absent any personal identification other than a testing number. No surveillance was imposed on those tested. The *Shoemaker* urinalysis was therefore qualitatively different from that at issue in this case and the district court's assessment of the intrusiveness of urinalysis is not controlling here.

Furthermore, compulsory urinalysis forces plaintiffs to divulge private, personal medical information unrelated to the government's professed interest in discovering illegal drug abuse. Advances in medical technology make it possible to uncover disorders, including epilepsy and diabetes, by analyzing chemical compounds in urine. Plaintiffs have a significant interest in safeguarding the confidentiality of such information whereas the government has no countervailing legitimate need for access to this personal medical data. The dangers of disclosure as a result of telltale urinalysis range from embarrassment to improper use of such information in job assignments, security and promotion.

Both the Supreme Court and the Third Circuit have recognized a right of privacy in medical information. *See Whalen v. Roe,* 429 U.S. 589, 602, 97 S.Ct. 869, 878, 51 L.Ed.2d 64 (1977); *United States v. Westinghouse Electric Corp.,* 638 F.2d 570, 577 (3d Cir.1980). In *Shoemaker v. Handel,* the Third Circuit acknowledged that the medical disclosure resulting as a by-product of urinalysis created cause for grave confidentiality concerns. 795 F.2d 1136 (1986). The *Shoemaker* court nonetheless upheld the urine testing of jockeys as constitutionally reasonable. But it based its ruling on the fact that such confidentiality concerns had been carefully addressed in statutory regulations strictly limiting the use and publication of test results so as to guarantee the jockeys utmost confidentiality. 795 F.2d at 1144. The court's decision in *Shoemaker* is thus readily distinguishable from the case at hand. Plainfield had not established any procedural guidelines to govern the urine testing, and in particular had not taken any precautions to vouchsafe confidentiality. Quite to the contrary, following the suspension of those fire fighters who had tested positive for drugs, the City of Plainfield publicized its actions to the media. While no individuals were identified by name, the exposure has subjected all Plainfield fire fighters to public suspicion and degradation.

There can be no doubt on this record that the members of the Plainfield Fire Depart-

ment reasonably expected to be free from intrusive government urine testing while on the job. No provisions for mass urine testing were included in the collective bargaining agreement signed by the fire fighters and the City. No directive or policy statement authorizing the City of Plainfield to conduct such tests was ever written or communicated to the plaintiffs. There was absolutely no warning prior to the rude awakening on May 26, 1986 that submission to compulsory employee urine testing would become a condition of continued employment. Plaintiffs' reasonable expectations of privacy fell subject to the unbridled discretion of their government employer, contrary to the very tenet of the Fourth Amendment. *See Delaware v. Prouse, supra,* 440 U.S. at 654, 99 S.Ct. at 1396 (Fourth Amendment safeguards are necessary "to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field' ").

## The State's Interest

Defendants contend that fire fighters, as public servants, have a diminished expectation of privacy, or in fact, no expectation of privacy at all with respect to job-related inquiries by the municipality. As employer, the City bears ultimate responsibility for insuring that its firefighting force is fully capable of protecting the welfare and public safety of Plainfield's citizenry. Consequently, defendants claim that their interest in the discovery and elimination of drug abuse among fire personnel overrides any privacy rights fire fighters may have.

Defendants urge the court to find that theirs was an exempted search properly within the "employment context searches of government employees" exception to the Fourth Amendment. *See, e.g., United States v. Collins,* 349 F.2d 863 (2d Cir. 1965), *cert. denied,* 383 U.S. 960, 86 S.Ct. 1228, 16 L.Ed.2d 303 (1966); *Allen v. City of Marietta,* 601 F.Supp. 482 (N.D.Ga. 1985). This emerging body of case law suggests that the government as employer "has the same right as any private employ-

er to oversee its employees and investigate potential misconduct relevant to the employee's performance of his duties." *Allen v. City of Marietta*, 601 F.Supp. at 491.

The fundamental distinction between *City of Marietta* and this case, is that the warrantless search in *City of Marietta* was nevertheless based upon some reasonable, individualized suspicion that the employees subjected to urinalysis were under the influence of drugs while on the job. In *City of Marietta*, certain employees of the Board of Lights and Water had been observed smoking marijuana on the job. Only those employees toward whom a reasonable suspicion of drug use on the job was established were compelled to submit urine samples or resign. Similarly, in another employment context case involving urine testing of government employees, *Division 241 Amalgamated Transit Union (AFL–CIO) v. Suscy*, 538 F.2d 1264, (8th Cir.1976), the court upheld warrantless testing of city bus drivers who were involved in serious accidents or suspected of being intoxicated on the job, but only after two supervisory employees concurred as to the necessity of the test based on individualized, reasonable suspicion.

In each of these cases the city was able to insure the public welfare while still respecting individual employee's Fourth Amendment rights. The intrusiveness of the search was minimized because the government established an individualized basis for its need to search and carefully circumscribed the search's scope.

The City of Plainfield proceeded in its urine testing campaign without any specific information or independent knowledge that any individual fire department employee was under the influence of drugs. None of the 103 individual fire fighters compelled to submit to urine testing had received prior notice that their job performance was below standard. None of the 103 fire fighters tested were under investigation for drug use on the job. There was not an increased incidence of fire-related accidents or complaints of inadequate fire protection from the community. Defendants had no general job-related basis for instituting this mass urinalysis, much less any individualized basis.

*The Constitutional Standard*

 The deleterious effects of drug consumption upon public safety officers' ability to properly perform their duties is undeniably an issue legitimately within the City's concern. But the merits of the City's efforts to assure that all fire fighters are free from drug induced impairments and capable to perform their public service is not at issue in this case. Rather the question to be answered is whether the means chosen by the City to achieve this laudable goal are "reasonable" within the meaning of the Fourth Amendment. This court is compelled to conclude that they are not.

As justification for undertaking the department-wide search, defendants explain that the widespread, large scale drug use in all segments of the population leads to the "reasonable and logical inference that some of those affected may ultimately be employed in a public-safety capacity." *See* Brief Submitted on Behalf of Defendants at 14. Defendants contend that mass round-up urinalysis is the most efficient way to detect drug use.

 It is beyond dispute that the taking and testing of urine samples achieves the city's desired goal, namely the identification of employees who use drugs. But under the law, the results achieved cannot justify the means utilized and the constitutionality of a search cannot rest on its fruits. *See McDonell v. Hunter*, 612 F.Supp. 1122 (D.Iowa 1985).

 The sweeping manner in which defendants set about to accomplish their goals violated the fire fighter's individual liberties. As to each individual tested the search was unreasonable because defendants lacked any specific suspicion as to that fire fighter. *See e.g. Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968) ("[F]irst, one must consider 'whether the ... action was justified at its inception,' ... second, one must determine

whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place' ").

The invidious effect of such mass, round-up urinalysis is that it casually sweeps up the innocent with the guilty and willingly sacrifices each individual's Fourth Amendment rights in the name of some larger public interest. The City of Plainfield essentially presumed the guilt of each person tested. The burden was shifted onto each fire fighter to submit to a highly intrusive urine test in order to vindicate his or her innocence. Such an unfounded presumption of guilt is contrary to the protections against arbitrary and intrusive government interference set forth in the Constitution. Although plaintiffs' privacy and liberty interests may be diminished on the job, these interests are not extinguished and therefore must be accorded some constitutional protection.

■ The Fourth Amendment speaks in terms of individual guarantees. Every individual has the absolute right to be free from searches and seizures absent the establishment of some degree of reasonable suspicion against him or her. Even with respect to law enforcement investigations at the scene of a crime, courts have refused to permit police agents to transfer reasonable suspicion established against one individual to other individuals also present at the crime site. In these situations the court has reasoned that "the fourth amendment does not permit any automatic or casual transference of 'suspicion'". *United States v. Afanador*, 567 F.2d 1325, 1331 (5th Cir.1978). " 'Reasonable suspicion' must be specifically directed to the person to be searched." *Id.*, at 1331. "An investigatory search will be found constitutionally permissible only when supported by reasonable suspicion directed to the person to be searched". *Ybarra v. Illinois*, 444 U.S. 85, 89–91, 100 S.Ct. 338, 341, 62 L.Ed.2d 238 (1979); *See United States v. Clay*, 640 F.2d 157, 160 (8th Cir.1981). If we cannot impute suspicion from one individual legitimately under investigation to others in his presence, we cannot impute suspicion to an entire fire fighter force when no reasonable suspicion exists as to any one of the individuals to be searched.

■ Defendants undertook this search driven by the mere possibility of discovering that some fire fighters were using drugs and therefore might be impaired in their job performance at some future time because of this drug use. Such attenuated protestations of concern for the welfare of the Plainfield community, without more, cannot render the seizure of urine specimens constitutionally reasonable.

■ The Fourth Amendment allows defendants to demand urine of an employee only on the basis of a reasonable suspicion predicated upon specific facts and reasonable inferences drawn from those facts in light of experience. *McDonell v. Hunter, supra,* at 1130; *Division 241 Amalgamated Transit Union (AFL–CIO) v. Suscy*, 538 F.2d 1264, 1267 (7th Cir.1976). The reasonable suspicion standard requires individualized suspicion, specifically directed to the person who is targeted for the search. *See Ybarra v. Illinois, supra,* 444 U.S. at 89–91, 100 S.Ct. at 341; *Hunter v. Augur,* 672 F.2d 668 (1982); *Division 241 Amalgamated Transit Union v. Suscy, supra.* Divorcing the requirement of individualized suspicion from the reasonable suspicion standard, would leave "no readily apparent limitation on ... public officials' power to search." *U.S. v. Davis,* 482 F.2d 893, 905–08 (9th Cir.1973). Absent a requirement of individualized suspicion, the Fourth Amendment would cease to protect against arbitrary government intrusion.

■ Defendants argue that "mere suspicion" rather than "reasonable suspicion" should be the standard for urine testing of government employees given the weighty interest the state has in protecting the general public from the danger of impaired, unfit fire fighters. Concededly the state's interest is a weighty one, but the Fourth Amendment requires that it be balanced against the significant intrusion urinalysis imposes upon the individual fire fighters.

In this case it has been demonstrated that the intrusion engendered upon the many dedicated fire fighters and fire officials of Plainfield was severe. The humiliation experienced by governmental intrusion into, and surveillance of, a highly private bodily function; the compelled disclosure of personal physiological data not properly within the government's possession, without any confidentiality safeguards; the complete absence of notice or opportunity to refute such testing; the implied presumption of guilt borne by each individual fire fighter; the compulsion exercised upon threat of discharge—for all these reasons, the government may not continue to usurp unregulated and standardless discretion, but must instead comply with the minimal constitutional mandates.

The state's interest will not be significantly impaired by the individualized reasonable suspicion standard. The standard is not unduly burdensome. It does not leave the City without means of combatting the influence of drugs upon employees while on duty. Police officers and fire fighters are subject to constant observation by their superiors and co-workers. Certainly one so under the influence of drugs as to impair the performance of his or her duties must manifest some outward symptoms which, in turn, would give rise to a reasonable suspicion. Further, the imposition of an individualized, reasonable suspicion standard rather than the more stringent probable cause standard is already a significant concession of deference to the state's legitimate interests. By mandating the individualized, reasonable suspicion standard, courts have recognized the government's legitimate need to diminish employee's privacy rights in certain limited situations in order to better serve the public welfare.

Finally, defendants contend that the recent Third Circuit ruling in *Shoemaker v. Handel*, 795 F.2d 1136 (1986), upholding the constitutionality of breathalyzer and urinalysis testing of race horse jockeys absent any requirement of individualized suspicion, provides controlling precedent for the case at hand. This court disagrees.

In balancing the state's interest against that of individual jockeys, the considerations before the *Shoemaker* court differed dramatically from those in the instant case. First, horse racing unlike fire fighting, is an intensely regulated industry within the administrative search exception to the Fourth Amendment. *See, e.g. Donovan v. Dewey*, 452 U.S. 594, 602–05, 101 S.Ct. 2534, 2539–41, 69 L.Ed.2d 262 (1981) (coal mines); *United States v. Biswell*, 406 U.S. 311, 316–7, 92 S.Ct. 1593, 1597, 32 L.Ed.2d 87 (1972) (gun selling); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 76–77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970) (liquor industry).

Such pervasive regulation puts jockeys on notice that they will be subject to the intrusive authority of the Racing Commission. As explained in *Shoemaker*, the Commission has historically exercised its rule making authority in ways that reduce the justifiable privacy expectations of participants in the horse racing industry, most notably by endorsing warrantless searches of stables. *Id.*, at 1142. The *Shoemaker* court held that jockeys who become involved in this pervasively regulated industry do so with full knowledge that the Commission will exercise its authority to assure public confidence in the integrity of the races. Therefore, the court concludes, consent to personal searches is implied by each jockey's participation.

Although *Shoemaker* creates an exception to the individualized suspicion requirement, it is instructive that the exception created is very narrowly tailored. The court explicitly ties its decision to the unique circumstances surrounding "closely regulated industries". In the court's own words: "Our holding applies only to breathalyzer and urine sampling of voluntary participants in a highly-regulated industry." *Id.*, at 1142, n. 5. To read this exception broadly would violate the court's apparent intention. Precisely because fire fighting is not a pervasively regulated industry, the determination of what consti-

tutes a "reasonable" invasion of a fire fighter's privacy cannot be informed by the standards applied in *Shoemaker*.

Traditionally, the Plainfield Fire Department has not invoked intrusive regulatory authority in supervising its fire fighters' persons and effects. Plaintiffs in this case had no notice or warning that they would be subject to intrusive personal searches by Fire Department officials or other City officials. Nothing in the initial employment agreement nor any civil service requirements permits the conclusion that these fire fighters voluntarily forfeited their privacy interest in the same way as jockeys. Plaintiffs were not afforded an opportunity to make an informed employment decision based on the knowledge that they might be required to submit to intrusive government intervention on the job. Given these facts, the plaintiffs do not qualify as "voluntary participants in a highly regulated industry". The circumscribed ruling in *Shoemaker* cannot be applied to the instant search.

The reasonableness of a search is arrived at by balancing the interests of the state in conducting the search against the individual's privacy interest. That the Plainfield fire fighters retain a greater privacy interest on the job than do race horse jockeys is evident from the fact that racing is a closely regulated industry and fire fighting is not. What remains then is to compare the state's interest in the two cases.

The Third Circuit's determination in *Shoemaker* was largely influenced by concerns specific to the horse racing industry. For instance, the Court afforded great deference to the state's interest in "assuring the public of the integrity of the persons engaged in the horse racing industry" because the state had a direct financial stake in the revenue generated by public wagering on horses and because the court recognized the industry's unique vulnerability to "untoward influences". *Id.*, at 1141. Drug testing was the only "effective" means the state could employ in its effort to dispel long standing public suspicion of criminal influences permeating the

organized gambling associated with horse racing.

In *Shoemaker*, the court placed great emphasis upon the public's "perception" of the industry's integrity because, "[p]ublic confidence forms the foundation for the success of an industry based on wagering". *Id.*, at 1142. Although there may exist ways to detect drug use among jockeys, other than subjecting them to mandatory urinalysis, what was at stake in *Shoemaker* was the appearance of propriety. The state's interest was to demonstrate to the public that drug abuse was not interfering with racing. Mandatory, mass urinalysis provided such a demonstration.

Clearly, no one can deny that the public has an interest in the integrity of its fire fighting forces. Yet, the ability of fire fighters to perform their jobs is not dependent upon the public's "perception" of this integrity in the same way as the racing industry's. In other words, fire fighters can still continue to serve the public effectively, even in the face of unpopular public "perception". For the municipality of Plainfield then, it is not the demonstration of propriety that is essential but rather the determination of job-related capability. Such determination does not require mandatory, mass urinalysis, but can be safely accommodated by an individualized suspicion standard.

The Plainfield Fire Department has a long record of satisfactory service in protecting the safety of its citizenry. The citizens of Plainfield have not voiced any concern regarding their performance or their efforts. The public is well aware of the careful screening tests and exhaustive training undergone by all fire fighters. The civil service test and, the physical capacity requirements, all attest to the meticulous and conscientious manner in which fire fighters are selected. It is this process that establishes and ensures public confidence in its fire fighters.

The City of Plainfield is not seeking to combat public perception of "untoward influence" undermining its fire force. On the contrary, these fire fighters daily prove

their ability and their commitment on the job. Therefore, the state's interest in this case does not require the use of departmentwide urinalysis. Having determined that both the fire fighter's privacy rights in this case are greater than those of the jockeys, and that the state's interest is less than that of the Racing Commission, this court finds that the search in question does not fall within the *Shoemaker* exception.

Perhaps the most critical distinction between these two searches though, is the very careful procedural protections built into the *Shoemaker* testing system and the complete absence of procedural safeguards in defendants' urinalysis program. The jockeys in *Shoemaker* were assured that the results of their tests would be published only to a very few Commissioners. Specific agreement was obtained to keep such information confidential from enforcement agents.

 The City of Plainfield is in an entirely different posture. Governmental agents, once they possess incriminatory information concerning drug use, may not have the authority to withhold such information from prosecuting agents, even if that is their desire. More specifically, in the instant case, Plainfield charged the plaintiffs with "acts of criminal misconduct" in their formal written complaints. The potential for criminal prosecution that exists *vis a vis* the Plainfield fire fighters poses a greater intrusion than that faced by the *Shoemaker* jockeys. " ... [G]overnment investigations of employee misconduct always carry the potential to become criminal investigations". *Allen v. Marietta, supra,* at 491. In balancing the government's interest in conducting the search against the intrusiveness and potential harms plaintiffs may suffer, it is clear that Plainfield defendants must meet a much higher burden of reasonableness to justify subjecting plaintiffs to potential criminal charges. For these reasons, *Shoemaker* is not controlling on the present facts.

A balancing of the state's interest against the significant invasion of privacy occasioned by the urine testing requires a determination that defendants' conduct was unreasonable and violative of the Fourth Amendment.

*Due Process Claims*

 As civil servants employed by the Plainfield Fire Department, plaintiffs are endowed with constitutionally protected property interests in their tenure pursuant to the New Jersey statutory scheme governing municipal fire fighters. *See* N.J. S.A. §§ 40A:14–7 *et seq.* Specifically, N.J. S.A. § 40A:14–19 confers upon plaintiffs, as fire department employees, a reasonable expectation of continued employment unless and until "just cause" is established for their termination. N.J.S.A. § 40A–14–19 provides in pertinent part as follows:

> Except as otherwise provided by law no permanent member or officer of the paid or part-paid fire department or force shall be ... suspended, removed, fined or reduced in rank ... except for just cause as herein above provided and then only upon a written complaint, setting forth the charge or charges as against such member or officer so charged, with notice of a hearing ... which shall be not less than 10 nor more than 30 days from the date of service of the complaint. A failure to substantially comply with said provisions as to the service of the complaint shall require a dismissal of the complaint.

This statutory scheme bestows a property interest upon plaintiffs which cannot be abrogated by their government employer without due process. *See Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Johnson v. United States,* 628 F.2d 187, 194 (D.C.Cir.1980); *Jones v. McKenzie,* 628 F.Supp. 1500, 1504 (D.D.C.1986).

 Furthermore, plaintiffs have constitutionally recognized liberty and property interests in their individual reputations, and in the honor and integrity of their good names. Such protected reputational interests derive directly from plaintiffs' employment status as fire fighters and cannot be arbitrarily or capriciously infringed by

government officials either. *See, e.g., Paul v. Davis,* 424 U.S. 693, 708–09, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976); *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); *Jones v. McKeinzie,* 628 F.Supp. at 1505.

It is beyond argument that discharge on charges of drug abuse could severely affect these interests. The deprivation of plaintiffs' liberty and property interests trigger constitutional requirements of procedural due process. Defendants' actions impermissibly violated these protected liberty and property interests without due process of law.

The unannounced mass urinalysis testing that took place on May 26, 1986 and subsequently, was completely lacking in procedural safeguards. Such testing was unilaterally imposed by defendants as a condition of employment without prior notice to plaintiffs and without opportunity for plaintiffs to voice objection or seek the advice of counsel. There were no standards promulgated to govern such department-wide drug raids, nor any provisions made to protect the confidentiality interests of the fire fighters whose personal physiological information unexpectedly came into the hands of government authorities. Defendants precipitously exercised their unbridled discretion exhibiting a total lack of concern for the constitutional rights of their employees.

By compelling plaintiffs to participate in the urine testing under the threat of immediate discharge, defendants effectively coerced a waiver of any rights, including the right against self-incrimination, plaintiffs may have had under the collective bargaining agreement to challenge such unilateral actions. Defendants' conduct was in flagrant violation of the due process rights that inure to plaintiffs under both the New Jersey statutory regulations and the Fourteenth Amendment of the United States Constitution.

Defendants' actions are cause for particular concern given numerous reports challenging the reliability and accuracy of the urinalysis tests themselves. The procedural dangers inherent in relying on the results of such tests are well documented in both legal and medical literature. *See e.g. Jones v. McKenzie,* 628 F.Supp. at 1505–06 and authorities cited therein; see also M.K. Divoll and D.J. Greenblatt, *The Admissibility of Positive EMIT Results as Scientific Evidence: Counting Facts, Not Heads,* 5 Journal of Clinical Psychopharmacology 114–116 (1985). In light of these concerns, defendants' refusal to afford plaintiff a full opportunity to evaluate and review their personal test results or to have their own specimens re-tested by a technician of their choice offends traditional notions of fundamental fairness and due process.

On its face, N.J.S.A. § 40A:14–19 explicitly mandates that no suspension shall occur until an opportunity has been provided for the presentation of charges, hearing, opportunity for defense and an adjudication of guilt or innocence. This statute has been interpreted by the New Jersey courts to permit pre-hearing suspension where the suspension is clearly "procedural"—a temporary measure pending further investigation and a due process hearing—but impermissible where pre-hearing suspension is invoked as a punitive measure prior to the adjudication of guilt. *See D'Ippolito v. Maguire,* 33 N.J.Super. 477, 111 A.2d 78 (App.Div.1955). In the instant action, defendants conducted and terminated their investigation with the urinalysis testing conducted in late May and early June. The terminations without pay that followed for those who tested positive were unquestionably punitive in nature. Defendants gave no indication that they would conduct second tests to corroborate their initial findings, nor was mention made of a hearing procedure in the written complaints served upon the plaintiffs. Absent a sufficient procedural framework, defendants' delay in issuing the written complaints setting forth the charges against those terminated is unjustifiable.

Having held that defendants' search violated plaintiffs Fourth and Fourteenth

Amendment rights, this court finds that plaintiffs' termination was without just cause and therefore violative of due process. Apart from the constitutional adjudication, defendants complaint is hereby dismissed pursuant to N.J.S.A. § 40A:14–19.

*Permanent Injunction*

This matter was originally opened to the court on a motion for preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.

By consent the parties have agreed to submit the matter for a final determination on the record, conceding that no factual issues exist which would require additional hearings. In accordance with Federal Rule 65(a)(2), the court will consider this to be an application for permanent injunction.

This court finds that plaintiffs have met their burden of demonstrating that defendant City of Plainfield and its agents violated their constitutional rights by instituting compulsory, departmentwide, urine testing absent individualized reasonable, suspicion.

■ The invasion of Fourth Amendment privacy rights and Fourteenth Amendment substantive and due process rights as a result of defendants' conduct warrants the issuance of injunctive relief.

Absent injunctive relief, plaintiffs face the threat of immediate termination from their jobs without pay and without an opportunity for a due process hearing. Any opportunity for other employment has been jeopardized by the adverse publicity generated by this action, which has left each Plainfield fire fighter vulnerable to the suspicion of being a "drug abuser". Such harm cannot be adequately remedied at law.

Further, this court finds that requiring individualized, reasonable suspicion will not unduly burden the defendants' ability to insure its citizens a safe, unimpaired fire fighting force.

■ Title 42 Section 1983 of the United States Code, creates a federal statutory cause of action against any person "who, under color of any statute, ordinance, regulation, custom or usage, of any State ...

subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws [of the United States]." Defendants' by their actions have violated Title 42 Section 1983, depriving plaintiffs Plainfield Fire Fighters and Plaintiff Monica Tompkins, a Police Department employee, of the constitutional rights and privileges secured to them. *See e.g. McKinley v. City of Eloy*, 705 F.2d 1110, 1116 (9th Cir.1983) (cities and their officials and agents may be held liable under Section 1983 for causing violations of the constitutional or civil rights of other city employees).

CONCLUSION

The threat posed by the widespread use of drugs is real and the need to combat it manifest. But it is important not to permit fear and panic to overcome our fundamental principles and protections. A combination of interdiction, education, treatment and supply eradication will serve to reduce the scourge of drugs, but even a reduction in the use of drugs is not worth a reduction in our most cherished constitutional rights.

The public interest in eliminating drugs in the work place is substantial, but to invade the privacy of the innocent in order to discover the guilty establishes a dangerous precedent; one which our Constitution mandates be rejected.

For the foregoing reasons final judgment shall be entered in favor of the plaintiffs and an appropriate injunction shall issue against the defendant forthwith.

Counsel for the plaintiffs should submit an appropriate form of order in accordance with this opinion.