James **EGLOFF** and Susan Egloff, Plaintiff,

v.

**NEW JERSEY AIR NATIONAL GUARD, et al., Defendant.**

Civ. A. No. 86–4175.

United States District Court, D. New Jersey.

April 27, 1988.

James Egloff, pro se.

Susan Egloff, pro se.

John J. Chernoski, Deputy Atty. Gen., Trenton, N.J., for defendant.

## OPINION

GERRY, Chief Judge:

### INTRODUCTION

Two former members of the New Jersey Air National Guard ("Air National Guard" or "Guard"), Susan and James Egloff, brought this action under 42 U.S.C. §§ 1983, 1985 and 1986, the First, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and various state law theories, against the Air National Guard and several of plaintiffs' former supervisors in that organization.

In 1985, plaintiffs James and Susan Egloff both held the rank of staff sergeant in the Guard and were employed as civilian technicians by the State of New Jersey Department of Defense. In June of that year while on annual training exercises at Alpena, Michigan, plaintiffs contend that they were impermissibly ordered to undergo urine testing. They refused this order, and administrative discharge proceedings commenced against them for this refusal. For reasons not immediately relevant here, plaintiffs were not administratively discharged; rather, their enlistments were allowed to expire normally, and the Guard decided not to allow them to re-enlist.

The procedural history of this case is extremely long and extremely convoluted. Originally, in addition to their actions for damages, plaintiffs sought to enjoin the then pending administrative discharge of James Egloff, and sought re-enlistment for Susan Egloff, whose enlistment term had already expired. It is sufficient for our purposes here to note only that this court on February 6, 1987, dismissed all aspects of plaintiffs' complaint, save three. First, although not explicitly raised by plaintiffs, we found that the issue of whether defendants' order for a urinalysis violated plaintiffs' rights under the Fourth Amendment

to the Constitution compelled our *sua sponte* consideration. We therefore ordered supplemental briefing on this point. Second, we preserved plaintiffs' related Fifth Amendment challenge to the testing. Finally, while we dismissed, on immunity grounds, plaintiffs' damage claims brought pursuant to federal law—i.e., 42 U.S.C. §§ 1983, 1985, and 1986, and plaintiffs' state law damage claims brought against the Guard and the individual defendants in their official capacities, we requested additional submissions on the issue of whether the individual defendants were also immune from the pendant state law claims brought against them in their individual capacities. With the benefit of the additional briefing ordered by the court, we now are prepared to rule on defendants' motion to dismiss the remaining aspects of plaintiffs' state law claim; and on defendants' motion for summary judgment with respect to plaintiffs Fourth and Fifth Amendment challenges. In addition, plaintiffs have moved for reconsideration of their previously dismissed claims.

FACTUAL BACKGROUND

The facts giving rise to this action rival its procedural history in both complexity and confusion. Proper consideration of the remaining aspects of this case, however, requires the court to attempt a somewhat detailed treatment of the factual background. As this is a motion by defendants to dismiss and for summary judgment, this background must be presented in the light most favorable to the plaintiffs.

In June 1985, plaintiffs James and Susan Egloff were members of the Air National Guard's 177th Fighter Interceptor Group, performing two weeks of active duty at the Alpena Air National Facility pursuant to 32 U.S.C. § 503(a).[1] During this period, the Group's security section conducted an investigation of a break-in at the Group's Atlantic City Airport headquarters. This investigation uncovered allegations of drug use by several members of the Guard.

Two of these alleged drug users, Robert Hare and Dale Bowser, were interrogated. They admitted their involvement with drugs, and implicated the Egloffs as fellow drug users.

The security section relayed this information to the Group Commander, Col. Richard C. Cosgrave, and to the Base Commander, Lt. Col. Richard Serfass. They apparently decided to conduct urine testing upon all individuals who had admitted drug use or who had been implicated as drug users. Approximately seventeen individuals (including the plaintiffs) were slated for testing.

On the morning of June 10, 1985 plaintiffs were interrogated by members of the Base Security Police. Although they were informed of their rights under the Fifth Amendment and the Uniform Code of Military Justice, plaintiffs were not told of the substance of the charges levelled against them. Later that day, plaintiff James Egloff received an oral order from defendant Serfass to report to the base clinic to undergo a urinalysis. Defendant Serfass did not tell the plaintiff why the test was requested; indeed, according to the plaintiff, Serfass said that his name had been selected "randomly by a computer and had nothing to do with the Security Police interrogation." Plaintiffs' Motion for Reconsideration, ¶ 41. Defendant Larry J. Dalton, a Major in the Guard, explained the proposed procedure to the plaintiffs and assured them that James' testing would be performed along with a group of other individuals, that they would be provided sealed and individually-identified specimen bottles, and that the samples would be placed "under strict control". *Id.* at ¶ 42. James Egloff assented to this procedure, on condition that he could also have a second test of his sample conducted by a civilian hospital lab. Defendant Serfass allegedly agreed to this request. Plaintiffs' Complaint at ¶ 26.

**1.** 32 U.S.C. § 503(a) provides:

Under such regulations as the President may prescribe, the Secretary of the Army and the Secretary of the Air Force, as the case may be, may provide for the participation of the Air National Guard in encampments, maneuvers, outdoor target practice, or other exercises for field or coast defense instruction, independently of or in conjunction with the Army or the Air Force, or both.

When the plaintiffs arrived at the base clinic, however, the clinic supervisor informed James Egloff that his name didn't appear on the list to be tested. The supervisor further claimed ignorance of any request for a second test at a civilian lab. He allegedly handed James an open, 8–10 ounce unlabelled brown-colored bottle and told plaintiff to "go fill it up". Plaintiffs' complaint at ¶ 27. James protested that he was unable to provide the requested amount. The supervisor then told plaintiff to return the next day.

According to plaintiffs, that night they decided they would not submit to the urine testing. Consequently, on June 4, 1985, James Egloff refused a second, written order to repair to the clinic for the urine testing, and Susan Egloff declined to follow a similar demand made of her.

Proceedings for administrative discharge against both plaintiffs then commenced. After several postponements, plaintiff Susan Egloff's Administrative Hearing on her discharge was held on March 14, 1986. Before final action could be taken, however, her term of enlistment expired, and she was informed that, due to her refusal to obey orders and submit to the urinalysis, she would not be permitted to re-enlist. Consequently, Susan Egloff became ineligible for continued employment as a civilian technician. In addition, although classified as "honorable", her discharge was apparently coded to indicate that her separation from service had been "not voluntary".

On October 23, 1986, with James Egloff's administrative discharge hearing still pending, plaintiffs commenced this action. Subsequently, James Egloff's administrative proceedings followed a similar course as his wife's—he was not administratively discharged, but rather was refused re-enlistment when his term of service expired. As in Susan Egloff's case, this refusal occasioned a loss of James Egloff's civilian technician job and an "involuntary" honorable discharge.

LEGAL ANALYSIS

Presently before us is plaintiffs' Motion for Reconsideration of this court's February 6, 1987 Bench Opinion and Order, in which we, *inter alia*, dismissed most of plaintiffs' state and federal damage claims against the Guard and the individual defendants, and plaintiff Susan Egloff's claim that the Guards' refusal to re-enlist her violated her due process rights. We also must consider defendants' motion for summary judgment as to the constitutionality of the proposed urine testing, and defendants' motion to dismiss plaintiffs remaining state law actions.

I.

We turn first to plaintiffs Motion for Reconsideration. In our previous Bench Opinion, we held that plaintiffs' federal and state damage claims directed against the Air National Guard, and against the individually named defendants in their official capacities, were barred by the Eleventh Amendment. We further found that the federal damage claims brought against the defendants in their individual capacities could not proceed. We made this determination on the strength of the United States Third Circuit Court of Appeals decision in *Jorden v. National Guard Bureau*, 799 F.2d 99 (3d Cir.1986) *cert. denied* — U.S. ——, 108 S.Ct. 66, 98 L.Ed.2d 30 (1987). The *Jorden* court, applying the doctrine of federal immunity from torts arising out of or incident to military service developed by the Supreme Court in *Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) and *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), held that the Pennsylvania Air National Guard was immune from suit brought by a Guardsman under 42 U.S.C. §§ 1983, 1985 and 1986.

Finally, we ruled that plaintiff Susan Egloff had no due process right regarding her denial of re-enlistment in the Guard, because there exists no property interest in continued enlistment in military service. *Penagaricano v. Llenza*, 747 F.2d 55, 62 (1st Cir.1984).

Plaintiffs, proceeding now *pro se*, have filed an 82 page "Motion for Reconsideration". Most of this is taken up with an admirably detailed account of the facts,

which has aided this court greatly in its consideration of claims yet outstanding. As to the dismissed aspects of their action, however, plaintiffs have failed to provide the court with any pertinent case law or fact which this court may have overlooked. The cases they cite in the field of Eleventh Amendment immunity, for the most part, predate by years or decades the Supreme Court's seminal decision in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) which held that an action for damages against a state, even when the state is not the named party, is barred by the doctrine of sovereign immunity encompassed in the Eleventh Amendment. Further, plaintiffs provide us with no theory with which to distinguish our Circuit's decision in *Jorden v. National Guard Bureau,* nor with any reason for finding plaintiff Susan Egloff's claim for re-enlistment somehow implicates a property interest to which the due process protections of the Fourteenth Amendment might apply.

Accordingly, we must deny plaintiffs' motion for reconsideration.

## II.

■ In our February 6, 1987 Opinion, we noted that while plaintiffs have no protected property interest in re-enlistment, and therefore no procedural due process claim under the Fourteenth Amendment, "the Constitution does impose some limits on the exercise by a commanding officer of his discretion with respect to re-enlistment of personnel." Bench Op. at 19. Consequently, if plaintiffs could demonstrate that the order they disobeyed (which in turn cost them their re-enlistment) was itself violative of some constitutional guarantee, then plaintiffs could proceed with their action for reinstatement.

We further suggested that plaintiffs might be able to make such a showing under the Fourth or Fifth Amendments to the Constitution. *Id.* at 20. Subsequently, and by direction of the Court, the parties have framed these issues in the context of additional submissions to defendants' continued motion for summary judgment on the constitutionality of the urinalysis. We now proceed to an examination of these issues.

### The Constitutionality of the Urinalysis Under the Fourth Amendment

■ The Fourth Amendment to the United States Constitution states, in part:

The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated ...

Among courts of this district, and indeed among all courts that have examined the issue, "a consensus has developed that a mandatory urinalysis constitutes a search within the meaning of the Fourth Amendment." *Policemen's Benevolent Ass'n. of New Jersey, Local 318 v. Township of Washington,* 672 F.Supp. 779, 784 (D.N.J. 1987), (collecting cases). We believe without question that an order by a governmental employer requiring an employee to undergo a urine screen—with adverse consequences to follow if that order is not obeyed—clearly implicates the Fourth Amendment strictures against "unreasonable" searches.[2]

The Supreme Court has instructed that the determination as to what constitutes a reasonable search "requires a balancing of the need for the particular search against the invasion of personal rights that the

2. We reject unhesitatingly the government's somewhat facile argument that because the Egloffs refused to take a urinalysis and no "search" actually occurred, there can be no violation of the Fourth Amendment. This assertion is based solely on the strength of a single Eleventh Circuit Court of Appeals decision, *Everett v. Napper,* 825 F.2d 341 (11th Cir.1987), which was subsequently withdrawn. In the substituted opinion, *Everett v. Napper,* 833 F.2d 1507 (11th Cir.1987), the Eleventh Circuit, while noting that the plaintiff, Everett, had refused a direct order to undergo a urine test, nonetheless observed that:

Because Everett's continued employment was contingent upon his subjection to a search, we must determine whether the search offended the Fourth Amendment.

833 F.2d at 1511. Similarly here, the Egloffs were assured in no uncertain terms that refusal to take the drug test would spell the end of their tenure with the Guard.

search entails." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). It cannot be gainsaid that the need for this particular search was exceptionally compelling. Drug use among the military poses obvious and grave concerns for us all, and any hint that armed service members are engaged in unauthorized use of alcohol or controlled substances must be vigilantly pursued. On the other hand, a urinalysis screen unquestionably constitutes a highly pervasive invasion of personal rights. As Judge Sarokin observed in *Capua v. City of Plainfield*, 643 F.Supp. 1507, 1515 (D.N.J.1986):

> compulsory urinalysis forces plaintiffs to divulge private, personal medical information unrelated to the government's professed interest in discovering illegal drug abuse. Advances in medical technology make it possible to uncover disorders, including epilepsy and diabetes, by analyzing chemical compounds in urine.

Additionally, because many compounds, including drug metabolites, may be detected in the urine days or even weeks after ingestion, urine screening "involves 'probing into an individual's private life' as surely as if an employer would enter an employee's home to inspect for drugs or other contraband or to obtain more information about that employee." *Policemen's Benevolent Ass'n.*, 672 F.Supp. at 789, *quoting Feliciano v. City of Cleveland*, 661 F.Supp. 578, 586 (N.D.Ohio 1987).

It is not an easy task to weigh the competing interests involved here. Fortunately, the above-quoted formula in *Wolfish* goes further, suggesting not only that courts consider "the scope of the particular intrusion" but also carefully scrutinize "the manner in which it is conducted" and "the justification for initiating it." 441 U.S. at 559, 99 S.Ct. at 1884.

■ Typically, "justification" for a search under the Fourth Amendment translates into "probable cause". The element of probable cause however, is not "an irreducible requirement of a valid search." *New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). Indeed, cases from this and other jurisdic-

tions have squarely established that urine screenings for public employees in sensitive positions only requires "some quantum of individualized suspicion" of drug use to pass constitutional muster. *Lovvorn v. City of Chattanooga, Tenn.*, 647 F.Supp. 875, 880 (E.D.Tenn.1986); *McDonell v. Hunter*, 809 F.2d 1302, 1308–09 (8th Cir. 1987); *Policemen's Benevolent Ass'n.*, 672 F.Supp. at 788; *Capua*, 643 F.Supp. at 1522. Such a standard fits neatly into the confines created by this case, because while we recognize that the constitutional rights "enjoyed by those in the military community do not correspond identically to those enjoyed by civilians," *Dillard v. Brown* 652 F.2d 316, 323 (3d Cir.1981), "the imposition of an individualized, reasonable suspicion standard rather than the more stringent probable cause standard is already a significant concession of deference" to the institutional interests of the Air National Guard. *Capua*, 643 F.Supp. at 1518. The question therefore becomes whether the Guard had reasonable, individualized suspicion to search the Egloffs for narcotics.

■ We believe they clearly possessed such suspicion. The initial investigation of alleged drug use among Guard personnel uncovered some 15 individuals who admitted involvement. Two of these, Hare and Bowser, implicated the plaintiffs in numerous instances of drug activity, both at the plaintiffs' off-base housing and while they were on active duty. In *Everett v. Napper*, 833 F.2d 1507 (11th Cir.1987), an Atlanta firefighter, one Hodges, was observed conducting drug sales to several fire department members. When confronted, Hodges submitted a lengthy list of fire department personnel to whom he had sold narcotics. The plaintiff, Everett, was on that list. The court held that on this basis there was "no question that the City ... officials had reason to suspect that Everett may be involved in the use of illegal drugs." and therefore could properly order him to undergo a urinalysis. 833 F.2d at 1511. Similarly, we must conclude that the Air National Guard was "justified" in com-

manding the Egloffs to submit to the urine screen.

■ Before we can place a full constitutional imprimatur upon the urinalysis ordered in this case however, we must also inquire into the "manner in which it [was to be] conducted." *Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884. Courts before us have taken note of the fact that "the reliability of drug [screenings] depend on such factors as the certainty of specimen identification; specimen storage, handling, and preparation, preparation and storage of test reagents; *proper cleaning and calibration of testing instruments and hardware*; and qualification and training of laboratory personnel performing the test and interpreting the results." *National Treasury Employees Union v. Von Raab*, 649 F.Supp. 380, (E.D.La.1986) *rev'd on other grounds*, 816 F.2d 170 (5th Cir.1987); *cert. granted* —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988); *McDonell v. Hunter*, 809 F.2d at 1309 ("the equipment and procedure to be used [in drug testing] must provide sufficient guarantees of trustworthiness to permit the authorities to accurately determine the presence or absence of both drugs and alcohol in the urine.")

Indeed, in *Policemen's Benevolent Ass'n., supra*, Judge Rodriguez observed that many previous cases involving urinalysis screens "decried the absence of well-defined administrative guidelines and standards in drug testing programs." 672 F.Supp. at 789. In *Capua v. City of Plainfield, supra*, for example, the court complained that "Plainfield had not established any procedural guidelines to govern urine testing," which was "cause for concern given numerous reports challenging the reliability and accuracy of the urinalysis tests themselves." 643 F.Supp. at 1515, 1521. And, in *Lovvorn v. City of Chattanooga, supra*, the court noted that "[n]one of the methods for testing, nor any of the standards for analyzing the urine specimens ... were ever put into writing.... In

short, the administration of these tests [was] subject to ... standardless discretion." 647 F.Supp. at 877, 881. Even the Military courts have mandated that when drug evidence is obtained by a nonconsensual urinalysis "a special scrutiny of that evidence *and the means of obtaining it must be made.*" *United States v. Hillman*, 18 M.J. 638, 640 (N.M.C.M.R.1984) (emphasis added). "Shoddy and inadequate collection procedures are not acceptable." *Id.*, May, J. (concurring).[3]

Applying these principles to the case at hand renders this court unable to sanction the manner in which the proposed urinalysis was to be performed on the plaintiffs. Taking (as we must) all of plaintiffs' allegations as true, it appears that the testing was marked by a conspicuous absence of the most rudimentary non-procedural safeguards and guidelines. Plaintiff James Egloff was simply given an opened, unlabelled bottle and told to fill it; there were no apparent provisions for insuring nonadulteration of the sample or protecting its chain of custody. It is utterly unclear as to which method of testing would be performed, or whether a confirmatory test would be conducted. We are equally troubled by plaintiffs averment that they were never informed of the purpose of the testing; indeed James Egloff contends that he was actively misled as to the reason for the testing. At least one court has demanded that urine testing which is performed on the basis of "reasonable suspicion, based on specific, objective facts and reasonable inferences drawn from those facts" may be ordered only if the "specific, objective facts [are] disclosed to the employee at the time the demand is made." *McDonell v. Hunter*, 809 F.2d at 1309. Also disturbing is plaintiff James Egloff's claim that there existed no provision for retesting his sample at a civilian lab. In *Von Raab*, the Court of Appeals for the Fifth Circuit approved a testing procedure, in large mea-

---

**3.** While most of these cases have discussed the importance of proper standards and procedures in drug testing only in the context of the Fifth Amendment guarantee of due process, *Wolfish* teaches that the manner in which urinalysis screens are performed also implicates Fourth Amendment concerns. *See e.g., Lovvorn v. City of Chattanooga*, 647 F.Supp. 875, 881 (E.D.Tenn. 1986.)

sure because it provided that an employee could "resubmit a specimen pronounced positive to a laboratory of his own choosing for retesting." 816 F.2d at 181. We do not imply that Federal Courts are uniquely qualified to set out specific technical guidelines as to proper methods for urinalysis testing. *But see, McDonell v. Hunter,* 809 F.2d at 1309 (Court prescribing equipment and procedure to be employed in urine screenings). However, we think it beyond doubt that our duty to scrutinize urinalysis testing methods under the Fourth Amendment requires satisfaction that the methods contain at least some modicum of reliability to pass the threshold of reasonableness. It may well be that the facts as further developed will convince this court or, at a later stage, a trier of fact, that the manner of testing here proposed was sufficiently trustworthy. On the record before us, however, such a determination cannot now be made. Accordingly, defendants' motion for summary judgment as to plaintiffs' Fourth Amendment claim must be denied.

### The Constitutionality of the Urinalysis Under the Fifth Amendment

█ The Fifth Amendment provides in pertinent part that "no person shall be compelled in any criminal case to be a witness against himself". Defendants argue that the Fifth Amendment is inapplicable in this case because its protections against self-incrimination are applicable only to "testimonial compulsion", and not to incriminatory evidence obtained by chemical analysis upon bodily fluids.

We agree. In *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) the Supreme Court clearly established that the Fifth Amendment does not apply to physical extractions from the body. Following *Schmerber,* state, federal and military courts have uniformly held that a urinalysis test cannot violate the Fifth Amendment. *City of Palm Bay v. Bauman,* 475 So.2d 1322, 1324 (Fla.App. 1985); *National Treasury Employees v. Von Rabb, supra,* 816 F.2d at 181; *Rushton v. Nebraska Public Power Dist.,* 653 F.Supp. 1510, 1527–28 (D.Neb.1987); *Murray v. Haldeman,* 16 M.J. 74, 80–81 (C.M. A.1983); *United States v. Armstrong,* 9 M.J. 374, 377 (C.M.A.1980).

Consequently, defendants' motion for summary judgment on the issue of whether the urinalysis order violated the Fifth Amendment is granted.

### III.

█ We turn finally to plaintiffs remaining state law damage claims directed against the individual defendants in their individual capacities. We previously held that *Jorden v. National Guard Bureau, supra,* a case out of our own Third Circuit and binding upon this court required us to find that the individual defendants here were absolutely immune from suit for damages under the federal civil rights statutes. At the same time, we noted that neither party had addressed the liability of the individual defendants under the pendant state law claims, and we invited both sides to brief the issue. Only the defendants have thought fit to accept this invitation. They argue that the legal and logical underpinnings of *Jorden* suggest its application to suits for damages brought under state law.

We are inclined to agree. In addition to bringing federal civil rights actions against his superiors in the Pennsylvania Air National Guard, the plaintiff in *Jorden* also asserted "a pendant state common law claim of defamation." 799 F.2d at 102. The Third Circuit dismissed this cause of action, "in light of the recent decisions of the [Supreme] Court restricting the availability of damage actions against the military." *Id.* at 108, n. 12. Specifically, the *Jorden* court was referring to the Supreme Court's decision in *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). There, the Supreme Court stated:

The special nature of military life—the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel—would be undermined by a judicially created remedy exposing officers to personal liability at the hands of those they are charged to command. Here, ... we

must be "concern[ed] with the disruption of '[t]he peculiar and special relationship of the soldier to his superiors' that might result if the soldier were allowed to hale his superiors into Court"

462 U.S. at 304, 103 S.Ct. at 2367, *quoting Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 676, 97 S.Ct. 2054, 2060, 52 L.Ed.2d 665 (1977). Additionally, the court in *Jorden* was aware, as are we, of an earlier Third Circuit case, *Jaffee v. United States*, 663 F.2d 1226 (3d Cir.1981) (en banc), *cert. denied*, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982), which held that the established doctrine of military immunity precluded state causes of action against federal military officers, because "[s]uits founded on state law have the same potential for undermining military discipline as federal tort claims." 663 F.2d at 1239.

Consistency with these authorities, we believe, requires the court to hold that plaintiffs' damage claims against their Air National Guard founded upon state law for actions which allegedly transpired while plaintiffs were participants in military training pursuant to Title 32 of the United States Code are barred by the military immunity doctrine. Accordingly, plaintiffs' outstanding pendant state law actions against the individual defendants are dismissed.

To summarize: plaintiffs' motion for reconsideration is denied. Defendants' motion for summary judgment is granted as to plaintiffs' Fifth Amendment claim, but denied without prejudice as to plaintiffs' Fourth Amendment claim. Defendants' motion to dismiss plaintiffs' pendant state law claims is granted. The court will prepare an appropriate order.