**NATIONAL TREASURY EMPLOYEES UNION and Argent Acosta, President, Chapter 168, National Treasury Employees Union, Plaintiffs-Appellees,**

v.

**William Von RAAB, Commissioner, United States Customs Service, Defendant-Appellant.**

No. 86–3833.

United States Court of Appeals, Fifth Circuit.

April 22, 1987.

Richard K. Willard, Asst. Atty. Gen., James M. Spears, Robert J. Cynkar, Deputy Asst. Attys. Gen., Robert V. Zener, Brook Hedge, Richard Greenberg, Brian Kennedy, Robert Chesnut, Leonard Schaitman, Dept. of Justice, Appellate Staff, Civil Div., Washington, D.C., for defendant-appellant.

Joyce A. Foreman, Sacramento, Cal., amicus curiae, for Foreman.

Nelson G. Dong, Terence M. Kelly, Palo Alto, Cal., amicus curiae, for PharmChem Laboratories, Inc.

Lois G. Williams, Charles C. Garretson, Elaine D. Kaplan, Nat. Treasury Employees Union, Washington, D.C., for plaintiffs-appellees.

William P. Quigley, ACLU, David C. Whitmore, New Orleans, La., amicus curiae, for ACLU.

Before RUBIN, HILL, and EDWARDS,[*] Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A union challenges a program adopted by the Customs Service requiring employees seeking transfer to certain sensitive jobs to submit to urine testing for drug use. The prevention of illicit drug use has become a major national concern. Congress has appropriated unprecedented sums to interdict drug smuggling, the President has issued an executive order requiring all federal agencies to adopt programs that will eliminate drugs from the federal workplace,[1] and hundreds of private employers, including more than a quarter of the Fortune 500 companies, have instituted some kind of program for urinal-

---

[*] Circuit Judge of the Sixth Circuit, sitting by designation.

1. Exec. Order No. 12,564, 55 U.S.L.W. 2177–78 (Sept. 30, 1986); N.Y. Times, Feb. 20, 1987, § 1, at 9, col. 6 (National Edition).

ysis testing of employees.[2] Employee drug use costs the United States an estimated $33 billion per year.[3] The seriousness of the problem has led to efforts to combat drug use by the use of novel methods, such as compulsory testing. Adoption of these methods, however, has created concern that constitutional rights may be abridged in the process.[4] Even the war on crime must be fought by constitutional methods for the Constitution protects the guilty as well as the innocent and proscribes condemned means even when they are used for laudable ends. Considering all of the circumstances involved, we hold that the Customs Service testing program constitutes a search within the meaning of the fourth amendment, but, because of the strong governmental interest in employing individuals for key positions in drug enforcement who themselves are not drug users and the limited intrusiveness of this particular program, it is reasonable and, therefore, is not unconstitutional.

## I.

For some time, the United States Customs Service has viewed the interdiction of narcotics smuggling as its top priority and has forbidden its employees to use the very drugs they are employed to intercept. In July, 1986, pursuant to a Directive by its Commissioner, the Service implemented a urinalysis drug screening program for applicants tentatively selected to engage in three kinds of jobs: positions that either directly involve the interdiction of illicit drugs, require the carrying of a firearm, or involve access to classified information. The covered positions start with top administrative posts and include criminal investigators, intelligence officers, customs inspectors, and even those clerical workers assigned to the tasks described. At first, the Customs Service tested only applicants for initial employment by the Service; after two months, the program was extended to current employees seeking a transfer to a covered position. Because no applicant for initial employment is a party to this suit, we consider the constitutionality of the program only as it applies to current employees seeking a transfer.

When it instituted the program, the Customs Service emphasized its "special responsibility to insure [a drug-free] workforce." The Service is charged with "stemming the tide of illicit drugs entering [the United States]." Consequently, "Customs employees, more than any other Federal workers, are routinely exposed to the vast network of organized crime that is inextricably tied to illegal drug use.... as well as [to] illegal substances themselves." Illegal drug use "undermines ... the integrity of the Service," and, because illicit drugs are so expensive, drug users may be particularly susceptible to offers of bribes by smugglers.

The Customs Service did not attempt to justify drug screening on the ground that it suspected a significant level of drug use among its employees. Indeed, the Commissioner has described the Service as "largely drug free," and, in five months of testing, none of the tests of current employees seeking a job change was positive. Even among applicants not already employed, only one person's test was positive.

Under the drug-testing program, an employee tentatively selected for transfer to a covered position is advised in writing that the appointment is contingent upon successful completion of drug screening. At least five days after the Service sends the employee this notification, it schedules a time for his urinalysis. If the employee then withdraws his application, he may retain his present position, and no adverse inference is drawn from his decision not to pursue his application. At the test site, an observer gives the employee a form on which he may list any medications he has taken or any other legitimate reasons for his having been exposed to potentially illicit

**2.** Miller, *Mandatory Urinalysis Testing and the Privacy Rights of Subject Employees: Toward a General Rule of Legality Under the Fourth Amendment,* 48 U.Pitt.L.Rev. 201, 202 (1986).

**3.** *Id.* at 203.

**4.** Curran, *Compulsory Drug Testing: The Legal Barriers,* 316 N.E.J.M. 318, 318 (1987).

drugs in the preceding thirty days. The form is sealed in an envelope that will not be opened unless the urine test is positive.

After the employee surrenders his outer garments and personal belongings, the observer gives the employee a bottle for the specimen. The employee then enters a restroom stall and produces the urine sample. In order to prevent tampering, the observer remains in the restroom to listen for the normal sounds of urination and to collect the sample immediately after urination, but the observer does not visually observe the act of urination. The employee then leaves the stall and presents the bottle containing the specimen to the observer. To ensure that a previously collected sample has not been proffered, the observer is instructed to reject an unusually hot or cold sample.

The Service uses strict chain-of-custody procedures after collection. The observer applies a tamper-proof seal to the bottle, the employee initials a label affixed to the seal and signs a chain-of-custody form, and the observer signifies that the procedures have been correctly followed. The observer then seals the sample in a bag together with other samples and mails the bag to a laboratory where both a tracking system and chain-of-custody record are maintained.

Laboratory employees test the samples for marijuana, cocaine, opiates, amphetamines, and phencyclidine (PCP). Initially, all samples are screened by the enzyme-multiplied-immunoassay technique (EMIT). Because EMIT yields a significant rate of positive results even in the absence of drug use, all positive samples are then screened by gas chromatography/mass spectrometry (GC/MS). Both parties agree that GC/MS provides a highly accurate test for the presence of drugs, assuming proper handling, storage, and testing techniques. If the GC/MS test is positive, the employee may designate a laboratory to test the original sample independently. Because EMIT will generally report the test for drug use as negative when five days have elapsed between the last use of drugs and the testing date, the test may fail to detect the prior use of drugs by persons who have abstained for five days.

The district court permanently enjoined all drug testing, both of employees and applicants for employment, 649 F.Supp. 380 (1986). It characterized the program as a search and seizure that violates legitimate expectations of privacy in the absence of probable cause or reasonable suspicion. Consequently, it held the testing unconstitutional under the fourth amendment. Although the issues were not raised by the union, the court also found that the plan violated the privilege against self-incrimination, penumbral constitutional rights of privacy, and, because of its unreliability, the due process clause.

## II.

The fourth amendment states

The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated....

As the Supreme Court recently reiterated in *Winston v. Lee*,[5] " 'the overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State.' "[6] The values of individual privacy and dignity are " 'basic to a free society,' "[7] and the fourth amendment protects these values by recognizing the "individual's legitimate expectations that in certain places and at certain times he has 'the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.' "[8]

The amendment explicitly protects against two different types of govern-

---

5. 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985).

6. *Id.* at 759–60, 105 S.Ct. at 1616 (quoting *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966)).

7. *Winston,* 470 U.S. at 759–60, 105 S.Ct. at 1616 (quoting *Schmerber,* 384 U.S. at 767, 86 S.Ct. at 1834).

8. *Winston,* 470 U.S. at 757–58, 105 S.Ct. at 1615–16 (quoting *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting)).

mental invasion: searches and seizures. A search occurs when the government infringes "an expectation of privacy that society is prepared to consider reasonable." [9] Seizure of a person occurs when the government meaningfully interferes with his liberty,[10] and seizure of property occurs when the government meaningfully interferes with an individual's possessory interests in property.[11]

Not all invasions of privacy or interferences with liberty or property, then, are searches or seizures. Before the infringement can be labeled either "search" or "seizure," in the sense in which those words are used in the fourth amendment, the government action must be *unreasonable* or constitute a *meaningful* interference. These criteria are implied from the very use of the terms, "search" and "seizure." In addition, by its express text, the amendment prohibits only those searches and seizures that are unreasonable in the particular circumstances in which they are performed. In determining the constitutionality of the testing program, therefore, we look first to whether the urinalysis program is such a significant intrusion as to constitute a search or seizure, or both search and seizure,[12] in the sense in which those terms are used in the Constitution, and, if we determine it to be a search or seizure, then decide its reasonableness.

Because urine is a waste product routinely discharged from the body, and the testing is performed on a scheduled basis only if an employee has been tentatively selected for transfer to a covered position, the government contends that the Customs Service test does not infringe an employee's reasonable expectation of privacy or interfere meaningfully with his liberty or property and is therefore neither search nor seizure. The urine excreted for a drug test, however, is not expected to be a waste product, flushed down a toilet. Indeed, precautions are taken in the test procedure to prevent the sample from being thus disposed of.

In several ways, drug screening by urinalysis infringes the employee's reasonable expectation of privacy and thereby constitutes a search under the fourth amendment. There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom. While individuals may choose not to urinate in private but instead to use public toilet facilities, they make this choice themselves. Moreover, expectations of privacy in a particular activity do not exist on an all-or-none basis.[13] An individual, for example, may freely admit guests to his home without relinquishing the right to bar others [14] or may open the curtains of his home to the view of unenhanced vision without consenting to the view of a telescope.[15] Similarly, even the individual who willingly urinates in the presence of another does not "'reasonably expect to discharge urine under circumstances making ... discover[y of] the personal physiological secrets it holds'" possible.[16]

Urine testing may disclose not only the presence of drug traces but much addition-

**9.** *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984).

**10.** *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968).

**11.** *Jacobsen,* 466 U.S. at 113, 104 S.Ct. at 1656.

**12.** *Texas v. Brown,* 460 U.S. 730, 747–48, 103 S.Ct. 1535, 1546, 75 L.Ed.2d 502 (1983) (Stevens, J., concurring).

**13.** *O'Connor v. Ortega,* — U.S. ——, ——–——, 107 S.Ct. 1492, 1504–05, 94 L.Ed.2d 714 (1987) (Scalia, J., concurring).

**14.** *United States v. Lyons,* 706 F.2d 321, 325 (D.C.Cir.1983).

**15.** *United States v. Taborda,* 635 F.2d 131, 138–39 (2d Cir.1980).

**16.** *Capua v. City of Plainfield,* 643 F.Supp. 1507, 1513 (D.N.J.1986) (quoting *McDonell v. Hunter,* 612 F.Supp. 1122, 1127 (S.D.Iowa 1985), *aff'd as modified,* 809 F.2d 1302 (8th Cir.1987)).

al personal information about an employee—whether the employee is under treatment for depression or epilepsy, suffering from diabetes, or, in the case of a female, pregnant. Even tests limited to the detection of controlled substances will reveal the use of medications prescribed for relief of pain or other medical symptoms.

Another perspective often sharpens the question whether a particular government action implicates the fourth amendment: the consequences of the characterization. As we observed in *Horton v. Goose Creek Independent School District*,[17] "[i]f an activity is not a search or seizure ... the government enjoys a virtual carte blanche to do as it pleases."[18] Hence, a finding that urine testing for drugs is not a search necessarily presumes that the ordinary individual's reasonable expectation of privacy would not be offended if the government, even without any articulable basis for suspicion, notified a person who had otherwise been properly stopped (seized, in the legal sense) that he must submit a urine sample for analysis. That presumption simply does not comport with contemporary mores. Unlike one's hair[19] or handwriting,[20] one's urine is not routinely exposed to the public gaze.

For these reasons, and in accordance with the other courts that have decided the question, we hold that compulsory urine testing by the government constitutes a search for purposes of the fourth amendment.[21] While compulsory urine testing is less aptly characterized as a seizure because the individual is not held against his will and the urine excreted cannot be considered meaningful property, the remainder of our analysis would apply equally whether the test is considered only a search, only a seizure, or both.

## III.

Because the fourth amendment proscribes only searches and seizures that are unreasonable,[22] we now analyze the Customs Service's urine testing program to determine whether it is a forbidden search. As the Supreme Court emphasized in *Bell v. Wolfish*,[23] that determination cannot be precisely made or decided by general rules susceptible of mechanical application. The validity of each different kind of search must be assessed by balancing the social and government need for it against the risk that the search will itself undermine the social order by unduly invading personal rights of privacy.[24] "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted," the Court said in *Wolfish*.[25] While "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure ... the Fourth Amendment imposes no irreducible requirement of such suspicion."[26] In certain limited situations,[27] "the balance of interests precludes insistence upon

---

**17.** 690 F.2d 470 (5th Cir.1982) (per curiam), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983).

**18.** *Id.* at 476.

**19.** *United States v. Weir,* 657 F.2d 1005 (8th Cir.1981) (per curiam).

**20.** *Gilbert v. California,* 388 U.S. 263, 265–67, 87 S.Ct. 1951, 1953–54, 18 L.Ed.2d 1178 (1967).

**21.** *See, e.g., McDonell,* 809 F.2d at 1307; *Capua,* 643 F.Supp. at 1513; *Allen v. City of Marietta,* 601 F.Supp. 482, 488–89 (N.D.Ga.1985). For a listing of the cases involving compulsory urine testing for drug use by employers, see the Appendix to this opinion.

**22.** *New Jersey v. T.L.O.,* 469 U.S. 325, 340–41, 105 S.Ct. 733, 743, 83 L.Ed.2d 720 (1985).

**23.** 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

**24.** *Id.* at 559, 99 S.Ct. at 1884.

**25.** *Id.*

**26.** *United States v. Martinez-Fuerte,* 428 U.S. 543, 560–61, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976).

**27.** *T.L.O.,* 105 S.Ct. at 743 (quoting *Almeida-Sanchez v. United States,* 413 U.S. 266, 277, 93 S.Ct. 2535, 2541, 37 L.Ed.2d 596 (1973) (Powell, J., concurring)).

'some quantum of individualized suspicion.' "[28] The Union concedes that the Customs Service might test employees who seek transfers if there were some degree of individualized suspicion, so we must balance the factors involved when tests are conducted in the absence of any such suspicion. The determination of fourth-amendment reasonableness requires consideration of the totality of circumstances in a particular case, weighing all of the factors suggesting constitutional violation against all of those indicating validity. We examine the factors here relevant, turning first to those mentioned by the Supreme Court in *Wolfish*.

## A. SCOPE AND MANNER

The Service has attempted to minimize the intrusiveness of the search. Unlike the procedure used when screening firefighters in *Capua v. City of Plainfield*,[29] the tester does not watch the employee while the urine sample is being produced. In addition, the screening is scheduled in advance instead of by surprise,[30] and employees are not tested until they have passed the other requirements for transfer to their new positions and have been tentatively approved. The degree of privacy invasion, while serious enough to implicate the fourth amendment, is not as intrusive as an invasion of bodily integrity[31] or of the home,[32] nor do employees suffer the indignity of either strip or body cavity searches.

The Customs Service program is also limited in total scope, thereby preventing the exercise of discretion concerning who is to be tested. Only employees seeking transfer to sensitive positions are required to take the test and only as a result of a process that they choose to set in motion. The urinalysis results are either positive or negative, leaving no room for official discretion in interpreting the tests.[33] The procedure therefore observes the requirement that, when searches are permitted in the absence of individualized suspicion, the government must employ safeguards to ensure that "the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.' "[34] Justice Powell observed in *Almeida-Sanchez v. United States*[35] that prosecutors "should not be the sole judges of when to use constitutionally sensitive means,"[36] but the testing program involves neither prosecutor nor prosecution. Under the Customs Service program, employees are protected from the abuses possible when government officials enjoy "almost unbridled discretion ... as to when ... and whom to search."[37]

## B. JUSTIFICATION

The use of illicit drugs has had a pernicious impact on American society. It significantly compromises the public's health, safety, and security. Drug smuggling has become an increasingly sophisticated enterprise, posing a formidable challenge to law enforcement. Moreover, the lucrative rewards for success provide a continuing temptation to engage in the unlawful enterprise. Congress has taken a number of

28. *Delaware v. Prouse*, 440 U.S. 648, 654–55, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) (quoting *Martinez-Fuerte*, 428 U.S. at 560, 96 S.Ct. at 3084).

29. 643 F.Supp. 1507, 1514 (D.N.J.1986).

30. *Id.* at 1518.

31. *Schmerber*, 384 U.S. at 767–70, 86 S.Ct. at 1834–35.

32. *Martinez-Fuerte*, 428 U.S. at 561, 96 S.Ct. at 3084.

33. *Shoemaker v. Handel*, 795 F.2d 1136, 1143 (3d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986).

34. *Prouse*, 440 U.S. at 655, 99 S.Ct. at 1396–97 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 532, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967)).

35. 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973).

36. *Id.* at 280, 93 S.Ct. at 2543 (Powell, J., concurring).

37. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 323, 98 S.Ct. 1816, 1826, 56 L.Ed.2d 305 (1978).

measures to interdict drug smuggling,[38] including the budget increase that we have already mentioned.

Use of controlled substances by employees of the Customs Service may seriously frustrate the agency's efforts to enforce the drug laws. An employee's use of the substances he has been hired to interdict casts substantial doubt upon his ability to carry out his duties honestly and vigorously,[39] and undermines public confidence in the integrity of the Service.[40] The drug user's questionable integrity, as well as the high financial cost of obtaining illegal drugs, may increase his susceptibility to bribery by criminal drug enterprises seeking classified information. Indeed, several Customs officers have been fired in past years for integrity violations such as accepting bribes. Drug suppliers may also subject a drug-using employee to blackmail. The illicit drug user may be tempted to divert for his own use portions of drug shipments that are seized. Finally, those employees involved in field operations, particularly if carrying firearms, endanger the safety of their fellow agents, as well as their own, when their performance is impaired by drug use. Like other public agencies,[41] the Customs Service has a strong interest in ensuring that its employees operate effectively. While a legislative declaration of the need for a particular search helps demonstrate its reasonableness,[42] an administrative declaration of need may suffice.[43]

## C. PLACE

The place at which the search is conducted, a restroom, is the most private facility practicable.

## D. VOLUNTARINESS

The Customs Service test is, to some extent, consensual. It is required only from those individuals who voluntarily seek employment in a covered position knowing in advance of the urinalysis requirement. Moreover, an employee may forgo drug screening by withdrawing his application before the urine test and no adverse inferences will be drawn. Consequently, the employee will not be penalized in his current job nor will he be disfavored if he reapplies later. The only adverse consequence that will follow a withdrawal of the application before testing is loss of the currently sought transfer. Only employees who test positive are subject to removal from the Service.

## E. EMPLOYMENT RELATIONSHIP

■ To fulfill its governmental function, the government must also be an employer of private citizens. As an employer, the government may exact from its employees what it may not require of others. Government employees may be subject to searches or other restraints on their liberties that would be impermissible in the absence of the employment relationship so long as these requirements are reasonably aimed at assuring integrity and competence.[44] Work-related searches that "are mostly incident to the primary business of [an] agency" may satisfy the fourth amendment's reasonableness requirement.[45]

■ This power to take those steps necessary to carry on the business of government is not, of course, without limits. The employment relationship does not

38. Anti-Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207 (1986).

39. *Heron v. McGuire,* 803 F.2d 67, 68 (2d Cir. 1986) (per curiam); *Masino v. United States,* 589 F.2d 1048, 1056, 218 Ct.Cl. 531 (1978).

40. *Shoemaker,* 795 F.2d at 1142.

41. *Ortega,* — U.S. at —–—, 107 S.Ct. at 1500–01 (plurality opinion).

42. *Serpas v. Schmidt,* 808 F.2d 601 (7th Cir. 1986).

43. *Colorado v. Bertine,* — U.S. —, 107 S.Ct. 738, 740, 741, 93 L.Ed.2d 739 (1987).

44. *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *Division 241, Amalgamated Transit Union v. Suscy,* 538 F.2d 1264, 1267 (7th Cir.) (per curiam), *cert. denied,* 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976).

45. *O'Connor v. Ortega,* — U.S. at —, 107 S.Ct. at 1500 (plurality opinion).

permit the government to impose unconstitutional conditions and the government cannot, therefore, undertake searches of its employees simply by making consent a condition of employment. Like consent to routine searches of paper bags as a condition of employment in a penitentiary,[46] the search must be a "reasonable condition of employment."[47] Considering the nature and responsibilities of the jobs for which applicants are being considered at Customs and the limited scope of the search, the exaction of consent as a condition of assignment to the new job is not unreasonable. It is not unreasonable to set traps to keep foxes from entering hen houses even in the absence of evidence of prior vulpine intrusion or individualized suspicion that a particular fox has an appetite for chickens.

### F. ADMINISTRATIVE NATURE OF THE SEARCH

 The Customs Service program has been adopted solely for an administrative purpose. While the fourth amendment protects against invasions for civil as well as criminal investigatory purposes,[48] the need for protection against governmental intrusion diminishes if the investigation is neither designed to enforce criminal laws nor likely to be used to bring criminal charges against the person investigated. Thus, when the police undertake "routine administrative caretaking functions" like inventory searches, particularly when they are not a subterfuge for criminal investigations, "[t]he probable-cause approach" and its concomitant requirement of a warrant are "unhelpful."[49] Similarly, visits by government officials to the homes of welfare recipients for the purpose of evaluating their eligibility for benefits do not abridge the fourth amendment.[50]

 Even a search solely for an administrative purpose is not per se reasonable.[51] The ubiquitous balancing test applies in this determination as well, entailing a weighing of the need for the search against its intrusiveness. Urine testing serves primarily the administrative function of assessing suitability for employment in a sensitive position, but it does so by searching for evidence of improper behavior. Such screening is not therefore as far removed from criminal investigation as routine inventory searches of an arrestee's personal effects to guard against claims of theft. Consequently, it is important that the government has demonstrated a need to test applicants for sensitive positions in order to assure both the integrity of the Customs Service and the absence of possible moral risk in the performance of their new duties by these applicants.

### G. ANALOGY TO REGULATED INDUSTRY

The Supreme Court has also recognized that, to ensure compliance with a regulatory scheme applicable to highly regulated industries, the government may undertake inspections of the premises occupied by those industries without a warrant[52] and without any degree of individualized suspicion.[53] The exception occurs when warrantless searches are necessary to accomplishment of the regulatory scheme and when the very existence of the federal regulatory program diminishes the reasonable expectations of privacy of those involved in

**46.** *United States v. Sihler,* 562 F.2d 349 (5th Cir.1977).

**47.** *Id.* at 351. *See also Ortega,* —— U.S. at —— ——, 107 S.Ct. at 1498–99 (plurality opinion).

**48.** *Ortega,* —— U.S. at —— —— ——, 107 S.Ct. at 1496–98 (plurality opinion); *T.L.O.,* 469 U.S. at 334, 105 S.Ct. at 740.

**49.** *South Dakota v. Opperman,* 428 U.S. 364, 370 n. 5, 96 S.Ct. 3092, 3097 n. 5, 49 L.Ed.2d 1000 (1976); *accord Bertine,* 107 S.Ct. at 741. *See*

*also Ortega,* —— U.S. at —— —— ——, 107 S.Ct. at 1500–01 (plurality opinion).

**50.** *Wyman v. James,* 400 U.S. 309, 317–25, 91 S.Ct. 381, 386–90, 27 L.Ed.2d 408 (1971).

**51.** *See, e.g., Bertine,* 107 S.Ct. at 742.

**52.** *Donovan v. Dewey,* 452 U.S. 594, 598–600, 101 S.Ct. 2534, 2537–39, 69 L.Ed.2d 262 (1981).

**53.** *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972).

the industry.[54] While this case does not involve a highly regulated private industry, it calls for the same kind of balance between the need for the search and the invasion of the individual's expectation of privacy. Individuals seeking employment in drug interception know that inquiry may be made concerning their off-the-job use of drugs and that the tolerance usually extended for private activities does not extend to them if investigation discloses their use of drugs.

## H. AVAILABILITY OF LESS INTRUSIVE MEASURES

■ While a particular search may be reasonable even if its purpose might be accomplished by less intrusive methods,[55] the availability of alternative sources of information or evidence [56] must at least be considered in determining the reasonableness of a particular search. In this case, the alternative sources of information do not eliminate the need for urine testing. Although the Service has had an opportunity to observe the performance of employees while they were working in non-sensitive positions, this provides scant basis on which to evaluate their integrity and reliability should they be assigned to work in sensitive positions.

The Service does screen applicants for sensitive positions by conducting full-field-background investigations. Those interviewed, however, may be reluctant to disclose their knowledge of the employee's drug use or may be unaware of his use, either because the employee has not disclosed this activity or because he has submitted names of only those references who do not know of his use. In any event, background investigations are themselves intrusive invasions of an individual's privacy.

## I. EFFECTIVENESS

As the Union observes, we must also consider the likelihood that the search will be a "sufficiently productive mechanism" for achieving its purposes,[57] for no privacy invasions should be permitted unless some good end is served. Because the test will usually fail to detect drugs used more than five days before testing and employees who have been notified of a test date may simply abstain from use, the Union concludes that the test sets a trap that will always be empty. Addicts may not be able to abstain for five days, however. Moreover, although drug screening may not detect many drug users who abstain for the several days preceding the test, a particular user still faces a significant risk that his test would be positive. Finally, employees may not always be aware of the fade-away effect. The risk of detection therefore may deter drug-using employees from seeking more sensitive positions.

■ Our brother Hill advances as a basis for his dissent that the test is not sufficiently effective in other ways: employees currently in sensitive positions are not tested and those transferred to sensitive positions are not again tested. Employees in sensitive positions are, however, subject to supervision that may be more intensive than employees in routine tasks. Moreover, offsetting the lesser effectiveness that is achieved by testing only applicants for sensitive jobs is the fact that these persons have volunteered for the jobs and have, in effect, by not withdrawing after notice, at least acquiesced in the test. The dissent, inconsistently it seems to us, argues that the testing program would be more likely to be constitutional if it were more pervasive and more invasive of privacy.

Taking all of the relevant factors into account, we conclude that the Customs Service program for testing employees who seek a transfer to sensitive positions is not unreasonable.

---

**54.** *Dewey,* 452 U.S. at 600, 101 S.Ct. at 2539.

**55.** *Bertine,* 107 S.Ct. at 743; *Illinois v. Lafayette,* 462 U.S. 640, 647–48, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983).

**56.** *Winston,* 470 U.S. at 764, 105 S.Ct. at 1619; Miller, *Urinalysis Testing, supra* note 2, at 214.

**57.** *Prouse,* 440 U.S. at 659, 99 S.Ct. at 1399; Miller, *Urinalysis Testing, supra* note 2, at 214.

## IV.

▉ Testing urine for the presence of drugs does not violate the privilege against self-incrimination. The privilege applies only to evidence that is testimonial.[58] Like blood samples,[59] voice exemplars,[60] or line-up identifications,[61] urine samples reveal "physical characteristics" only, not "any knowledge [the person tested] might have." [62]

▉ When the employee lists the medications taken and any circumstances involving legitimate contact with illicit drugs in the preceding thirty days, testimonial evidence is involved. The fifth amendment, however, protects compelled disclosure of incriminating information, not information that is merely private.[63] Questions about medications or legitimate contact with illicit drugs do not, by their nature, seek incriminating information. Like income tax returns, the Customs Service pre-testing forms may elicit incriminating information, but in the great majority of cases, they will not.[64] Indeed, the information will more likely exculpate the employee. The purpose of the questions is to discover information that will explain why a particular positive test does not reflect drug use and therefore permit the Customs Service to transfer the employee. And, even if the information were incriminating, it is hard to see how it would add significantly to the incrimination of the urine test.[65] The Union has not argued that the questions will elicit incriminating information;[66] in fact, the union does not even urge us to uphold the district court on fifth amendment grounds. Our decision not to strike the pre-test forms on fifth amendment grounds does not intimate any opinion about whether a particular employee may invoke the privilege against self-incrimination and refuse to fill out the forms.

## V.

▉ Because the Union does not seek to support the injunction on the basis of the penumbral rights of privacy, as developed in *Griswold v. Connecticut*[67] and *Roe v. Wade*,[68] apart from its fourth amendment argument, we express no opinion on that issue except to note that even the areas sheltered by such rights are limited by countervailing state interests.[69]

## VI.

▉ The drug-testing program is not so unreliable as to violate due process of law. While the initial screening test, EMIT, may have too high a rate of false-positive results for the presence of drugs, the union does not dispute the evidence that the follow-up test, GC/MS, is almost always accurate, assuming proper storage, handling, and measurement techniques. Customs also employs elaborate chain-of-custody procedures to minimize the possibility of falsely positive readings. Moreover, the employee may resubmit a specimen pronounced positive to a laboratory of his own choosing for retesting. Finally, the Customs Service program includes a quality-as-

---

58. *Fisher v. United States*, 425 U.S. 391, 408–09, 96 S.Ct. 1569, 1579–80, 48 L.Ed.2d 39 (1976); Note, Organizational Papers and the Privilege Against Self-Incrimination, 99 Harv.L.Rev. 640, 644 (1986).

59. *Schmerber*, 384 U.S. at 760–65, 86 S.Ct. at 1830–33.

60. *United States v. Dionisio*, 410 U.S. 1, 5–7, 93 S.Ct. 764, 767–68, 35 L.Ed.2d 67 (1973).

61. *United States v. Wade*, 388 U.S. 218, 221–23, 87 S.Ct. 1926, 1929–30, 18 L.Ed.2d 1149 (1967).

62. *Id.* at 222, 87 S.Ct. at 1930.

63. *United States v. Nobles*, 422 U.S. 225, 233 n. 7, 95 S.Ct. 2160, 2167 n. 7, 45 L.Ed.2d 161 (1975).

64. *Garner v. United States*, 424 U.S. 648, 660–61, 96 S.Ct. 1178, 1185–86, 47 L.Ed.2d 370 (1976).

65. *Fisher*, 425 U.S. at 410–11, 96 S.Ct. at 1581.

66. *Maness v. Meyers*, 419 U.S. 449, 474, 95 S.Ct. 584, 599, 42 L.Ed.2d 574 (1975) (White, J., concurring).

67. 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 1510 (1965).

68. 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

69. *Id.* at 153–54, 93 S.Ct. at 727.

surance feature. Control samples will be intermingled with those of the employees to measure the incidence of false-positive results. Quality-assurance reports will be provided to the Union. Hence, if the quality-assurance program indicates that false-positive results occur, employees may challenge the validity of their own positive tests on that basis.

We express no opinion concerning the constitutionality of testing applicants for initial employment, none of whom is a party to the suit or represented by the Union.

For these reasons, we VACATE the district court's permanent injunction against the Customs Service's drug screening program both as to applicants for employment and those employees seeking transfer to sensitive jobs, as defined in the present program.

### APPENDIX

Cases Involving the Use of Urine Testing for Drugs by Employers
*Public Employers*

I. Urinalysis is a reasonable search or seizure when a basis exists for individualized suspicion.

*Division 241, Amalgamated Transit Union v. Suscy,* 538 F.2d 1264 (7th Cir.), *cert. denied,* 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976) (bus drivers after serious accident or when suspected of using drugs).

*Allen v. City of Marietta,* 601 F.Supp. 482 (N.D.Ga.1985) (electric line workers who were observed smoking marijuana).

*Mack v. United States,* No. 85–Civ 5764 (S.D.N.Y. Apr. 21, 1986) (FBI agent suspected of drug use).

II. Urinalysis is a reasonable search or seizure in the absence of individualized suspicion.

*McDonell v. Hunter,* 809 F.2d 1302 (8th Cir.1987) (prison employees with daily, regular contact with prisoners in medium or maximum security prisons).

*Shoemaker v. Handel,* 795 F.2d 1136 (3d Cir.), *cert. denied,* —— U.S. ——, 107

S.Ct. 577, 93 L.Ed.2d 580 (1986) (race horse jockeys).

III. Urinalysis constitutes an unreasonable search or seizure in the absence of individualized suspicion.

*Capua v. City of Plainfield,* 643 F.Supp. 1507 (D.N.J.1986) (mass screening of police and firefighters).

*Jones v. McKenzie,* 628 F.Supp. 1500 (D.D.C.1986) (school bus attendant).

*Lovvorn v. Chattanooga,* 647 F.Supp. 875 (E.D.Tenn.1986) (all firefighters).

*American Federation of Government Employees v. Weinberger,* 651 F.Supp. 726 (S.D.Ga.1986) (employees in critical positions with the Army).

### *Private Employer*

*Association of Western Pulp and Paper Workers v. Boise Cascade Corp.,* 644 F.Supp. 183 (D.Or.1986).

ROBERT MADDEN HILL, Circuit Judge, dissenting.

I agree with the majority in Part II of its opinion that compulsory urine testing conducted by the Customs Service (Service) under the drug-testing program challenged here implicates fourth amendment rights. I do not agree, however, that the program is consistent with the requirements of the fourth amendment. My disagreement stems from my conclusion that the program at issue in this case is an ineffective method for achieving the Customs Service's goals, and thus it is an unreasonable invasion of the Customs Service's employees' fourth amendment rights. Therefore, I would hold that this particular program is unconstitutional.

The majority frames its examination of whether the testing program complies with the fourth amendment by questioning whether the search is reasonable. In analyzing this issue, the majority balances the social and governmental need for the testing against the risk that the search will undermine the social order by unduly in-

truding upon the employee's personal rights of privacy.[1]

An important weight in this balance is that the means chosen to accomplish the governmental interest must effectively achieve that goal. The majority opinion acknowledges the importance of the effectiveness element. *See* majority opinion, Part III (I) (after stating, "The Union observes that we must also consider the likelihood that the search will be a *'sufficiently productive mechanism'* for achieving its purposes, for no privacy invasions should be permitted unless some good end is served," the majority goes on to analyze this issue) (footnote omitted) (emphasis added); Part III (D) ("Government employees may be subject to searches or other restraints on their liberties that would be impermissible in the absence of the employment relationship so long as these requirements *are reasonably aimed* at assuring integrity and competence.") (footnote omitted) (emphasis added). I recognize that the effectiveness factor arises in only two instances in the majority's opinion, and that there are numerous other factors involved in the balance. However, I believe it is the most important factor, and I read the majority's opinion as also recognizing its preeminence.

The Supreme Court likewise has pointed out that an important factor in deciding if the government intrusion is reasonable is whether the measures adopted will achieve the objectives of the search. *See, e.g., T.L.O.,* 469 U.S. at 337, 105 S.Ct. at 741, 83 L.Ed.2d at 732 (the Court must balance privacy expectations against "the government's need for *effective* methods to deal with breaches of public order") (emphasis added); *T.L.O.,* 469 U.S. at 342, 105 S.Ct. at 744, 83 L.Ed.2d at 735 ("Such a search will be permissible in its scope when the *measures adopted are reasonably related to the objectives of the search....*") (emphasis added); *Delaware v. Prouse,* 440 U.S. 648, 659, 99 S.Ct. 1391, 1399, 59 L.Ed.2d 660, 671 (1979) ("The question remains,

---

1. I have some reservations with the method of analysis used by the majority in deciding whether the urine testing feature of the program is reasonable under the fourth amendment. The majority immediately engages in a balancing test, stating that, "While 'some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure ... the Fourth Amendment imposes no irreducible requirement of such suspicion.' In certain limited situations, 'the balance of interest precludes insistence upon "some quantum of individualized suspicion." ' " At 176–77. (footnotes omitted). The majority offers no explanation why this case presents a situation where no warrant, no probable cause, nor even any level of suspicion is required, contrary to the language of the fourth amendment.

I doubt whether the majority's analytical starting point is proper in light of the fourth amendment's explicit language. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause"). I believe, therefore, that some explanation should be made of why the warrant and probable cause requirement expressed in the fourth amendment should not be applied in this case, or at least why no level of suspicion is required. *Cf. New Jersey v. T.L.O.,* 469 U.S. 325, 351, 105 S.Ct. 733, 748, 83 L.Ed.2d 720, 741 (1985) (Blackmun, J. concurring) ("I believe that we have used such a balancing test, rather than strictly applying the Fourth Amendment's

Warrant and Probable Cause Clause, only when we are confronted with 'a special law enforcement need for greater flexibility.' ... Only in those special circumstances ... is a court entitled to substitute its balancing of interests for that of the Framers."). The usual fourth amendment analysis has centered on whether the authorities had a warrant, or, if not, whether they fit within an exception to the warrant requirement, and whether they had probable cause. *See T.L.O.,* 469 U.S. at 354–55, 105 S.Ct. at 750–51, 83 L.Ed.2d at 743. (Brennan, J., concurring in part and dissenting in part). Even in the cases in which the Supreme Court has determined that neither a warrant nor probable cause is required, it typically does set forth its reasons for such a determination. *See, e.g., O'Connor v. Ortega,* — U.S. ——–—, 107 S.Ct. 1492, 1498–1502, 94 L.Ed.2d 722–28 (1987) (discussing why no warrant is required and why probable cause is an inappropriate standard for public employer searches of their employees' offices). *But see Bell v. Wolfish,* 441 U.S. 520, 558–60, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447, 481–82 (1979) (concluding that body-cavity searches of prison inmates can be conducted in the absence of probable cause without explaining why neither a warrant nor probable cause was required). I do not now engage in such an analysis because even assuming without deciding that reasonable suspicion is not required, my conclusion that the drug-testing program is not reasonable due to its ineffectiveness makes a discussion of that issue unnecessary.

however, whether in the service of these important ends [the government interests] the discretionary spot check is a *sufficiently productive mechanism* to justify the intrusion upon Fourth Amendment interests....") (emphasis added). Thus, a necessary element in order to have a reasonable drug-testing program under the fourth amendment is a program that will achieve its objectives, i.e., an effective program.

I believe that the present program is ineffective in the accomplishment of its goals for three basic reasons. First, customs agents that are currently employed in sensitive positions are not tested. Thus, a substantial amount of the current workforce would not be subjected to testing. Although perhaps in the future under the program most of the employees in sensitive positions will have been tested, we are examining the effectiveness of the program at this time. Second, once a tested employee is accepted into a covered position, he is never tested again. It could easily be the case that this "clean" employee will later succumb to the temptation of the use of drugs without being detected. Finally, and most importantly, employees given a five day notification of a test date need only abstain from drug use to prevent being identified as a user. The majority, however, points out that an addict may not be able to abstain for five days. However, it would seem that a person so addicted will be identified as a drug user without the need for a urine test. Also, the majority states that a drug user still faces a significant risk that his test would be positive and therefore he may be deterred from seeking a more sensitive position. However, he also could postpone applying for a sensitive

position until he is sure that there is no possibility of detection.[2] In sum, in my opinion the Service's program is ineffective in accomplishing the goals it purportedly seeks to accomplish.

Since I do not believe that the program here achieves its sought after goal, I find it is unreasonable and thus violative of the fourth amendment. I see no reason to allow this invasion of the employees' fourth amendment rights without some concomitant benefit to society.[3]

For these reasons, I respectfully dissent from the majority opinion.

---

2. The Service, in response to the question by the court, "How easily can a drug user avoid detection by abstaining from drug use five days before the urinalysis?", stated that it would remove the five-day notification provision from the testing program. Even assuming that at this point in the appeal the Service can alter the testing program, such a change would not affect my conclusion that the program is ineffective. The potential employee merely has to abstain from drug use for a short period prior to applying for a sensitive position. Then, any testing

would be negative, and after being accepted, the employee could resume using drugs with no potential for being discovered as a drug user.

3. I recognize that my views can be seen as advocating a more intrusive and more far-reaching drug-testing program. I emphasize, however, that I do not mean to imply that I would necessarily find such a program constitutional. Such a program will also have to be examined on its own merits.